**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| In re: | ) | |
|     M.W. Sewall & Co., | ) | Chapter 11 |
|         Debtor | ) | Case No. 09-20400 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Memorandum of Decision**

M.W. Sewall & Co. ("Sewall") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code[1] on March 27, 2009. Shortly thereafter, the State of Maine Bureau of Alcoholic Beverages and Lottery Operations (the "Bureau") moved for relief from stay, seeking an order requiring Sewall to remit to it all receipts of lottery tickets delivered to Sewall prepetition, whether sold by Sewall pre- or postpetition.

The Bureau asserts that Sewall's estate has no right to the lottery ticket sale receipts because Sewall holds them "in trust," or, alternatively, because Sewall serves simply as a conduit by which the receipts pass to the Bureau. Both parties agree that these issues are pivotal, and that the Bureau's motion stands or falls on their resolution.[2]

---

[1] All references to the "Bankruptcy Code" or "Code," or to chapter numbers or statutory sections, unless otherwise indicated, are to the Bankruptcy Code of 1978, as amended, 11 U.S.C. § 101, et seq.

[2] In this respect, the relief from stay motion poses far more than the question of whether the Bureau can demonstrate "a colorable claim to property of the estate." See Grella v. Salem Five Cents Savings Bank, 42 F.3d 26, 33 (1st Cir. 1994). Rather, it requires a final determination of the relative rights of the estate and the Bureau. As such, the Bureau should have initiated an adversary proceeding. See id. ("The statutory and procedural schemes, the legislative history, and the case law all direct that the hearing on a motion to lift the stay is not a proceeding for determining the merits of the underlying substantive claims, defenses or counterclaims."); see also Fed.R.Bankr.P. 7001(2) (requiring an adversary proceeding in order "to determine the validity, priority, or extent of a lien or other interest in property . . . ."). The relevant parties all acknowledge this, and have consented to my finally determining what interest

1

I conclude that the relationship between Sewall and the Bureau is one of debtor/creditor rather than one of trustee/beneficiary or conduit/destination. This is so because Sewall purchased the lottery tickets from the Bureau before filing for bankruptcy protection. Sewall had the ability to do with lottery ticket sale receipts as it pleased, agreeing only that a designated account (in which the receipts were commingled with other cash) would hold sufficient funds to pay the Bureau what it was owed when the Bureau electronically swept the account at specified intervals. Therefore, the Bureau's motion must be denied.

**Background**[3]

The Bureau is a State of Maine agency which conducts the day-to-day operations of the Maine State Lottery, in accordance with the Regulations of the Department of Administrative and Financial Services, State Liquor and Lottery Commission (the "Rules").[4] Its director is charged with supervising the operation of all lottery games in Maine.[5] The Maine State Lottery Commission (the "Commission") sells and administers lawful games of chance[6] to fund certain

---

the Bureau has in the lottery ticket sale receipts, notwithstanding the procedural posture. See infra, note 3.

[3] This dispute has been submitted on a stipulated record. Sewall's Chapter 11 trustee (appointed October 29, 2009), the Bureau, and TD Bank, which claims a security interest in, *inter alia*, Sewall's accounts, all join the stipulation.

[4] The Rules are found at 18 C.M.R. 364, Chapter 1. A copy was provided as Exhibit A to the stipulation.

[5] See 8 M.R.S. §§ 371(1), 372.

[6] Along with instant lottery tickets ("scratch tickets"), on-line lotteries conducted by the Maine State Lottery include Powerball, Megabucks, Mega Millions, Hot Lotto, Weekly Grand, Pick 3 and Pick 4. See http://www.mainelottery.com/index.html (*last visited* July 14, 2010).

State programs.[7]

Sewall operated a chain of convenience stores, called "Clipper Marts," throughout Maine. Sewall was authorized (via eleven separate license agreements) to sell lottery tickets at eleven Clipper Mart locations.[8]

Under the license agreements between Sewall and the Commission, Sewall purchased instant lottery tickets from the Commission upon ordering or accepting delivery of them.[9] Once Sewall took delivery of lottery tickets, it bore the risk of their loss.[10] The Commission was empowered to require Sewall to establish accounts into which lottery ticket sale receipts were to be deposited, and to authorize the Commission to electronically transfer to itself funds owed it.[11]

---

[7]   See 8 M.R.S. §§ 386, 387.

[8]   The parties agree that the eleven license agreements are in substance identical. The terms of the agreements are set forth in Exhibit B to the parties' stipulation.

[9]   According to the Rules, Ch. 1.11.2:

**Effect of order or acceptance of tickets.** All instant tickets, ordered or accepted by an agent from the State Lottery or its authorized representative, are deemed to have been purchased by the agent.

(See Ex. A to Stipulation at 10).
  While I note that this particular provision does not address an agent's purchase of on-line tickets, which are only generated by an agent at the time they are sold to customers, it matters not to the result of my analysis.

[10]   License Agreement at ¶ I.A.(3). (See Ex. B to Stipulation at 1).

[11]   The Bureau may:

require agents to establish electronic funds transfer (EFT) accounts and establish procedures for transferring funds from the account that are owed to the State Lottery on a timely basis. An agent shall deposit into the agent's EFT account on a timely basis all money received from the sale of lottery tickets, less the amount of any sales commissions, fees and sums paid to winners as prizes by the agent.

3

Sewall was contractually responsible for interest on overdue amounts owing to the Commission and collection costs.[12] The pertinent regulations authorize the Commission to establish procedures to suspend or terminate licenses if an agent has "accumulated at least 3 notices of insufficient funds to pay amounts owed to the State Lottery."[13] In connection with those procedures, the Commission may require that an agent pay "all amounts owed" and that an escrow account be established "to ensure payment before the agent's license may be reactivated."[14]

Sewall designated its general operating account as the account into which lottery ticket sale receipts were deposited and from which the Commission was authorized to transfer amounts Sewall owed it. Sewall routinely deposited ticket revenues into that account. The account was not specially designated vis-a-vis the Commission in any other way. As the arrangement anticipated, the Commission "swept" the account weekly, transferring to itself amounts due to it and providing an accounting to Sewall.

As of the filing date, Sewall held a substantial number of instant lottery tickets in hand. Thereafter, Sewall sold those tickets in the ordinary course. Sewall also owed the Bureau for on-line and instant lottery tickets Sewall had sold prepetition.

Of course, after Sewall's petition was filed, § 362's automatic stay precluded the Commission's electronic sweeping of the account containing the receipts of both the instant and

---

Rules, Ch. 1.11.8. (See Ex. A to Stipulation at 10).

[12]    License Agreement at ¶ I.A.(10), (11). (See Ex. B to Stipulation at 2).

[13]    Rules, Ch. 1.11.9. (See Ex. A to Stipulation at 10).

[14]    Id.

4

on-line lottery ticket sales. Sewall characterized its outstanding obligation to the Commission as a mill run unsecured debt and did not pay it. The Commission, through the Bureau, moved for relief from the stay, seeking to liberate the sale receipts of all lottery tickets delivered to Sewall prepetition from Sewall's operating account. Pending resolution of that motion, the parties agreed to an order under which Sewall transferred $182,314.84 into escrow, with all parties, including TD Bank, reserving their rights. For present purposes, that sum represents the amount agreed by the parties to be the dollar amount of lottery tickets delivered to Sewall prepetition and not yet accounted for to the Bureau, minus Sewall's contractual commission.

## Discussion

The Bureau bets it can demonstrate that Sewall's bankruptcy estate holds no beneficial interest in lottery ticket sale receipts in two ways: (1) the "trust" theory and (2) the "conduit" theory. Neither is a winner.

**1. Trust Theory**

Section 541 sets out the content of the bankruptcy estate. Pertinent here is the estate's inclusion of "all legal or equitable interests of the debtor in property as of the commencement of the case,"[15] as qualified by the exclusion of "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . ."[16] The Bureau's assertion that Sewall holds lottery ticket sale receipts in trust and, therefore, that those receipts should be released to it, rather than administered as part of Sewall's bankruptcy estate (subject to

---

[15] See § 541(a)(1).

[16] See § 541(d); see also U.S. v. Whiting Pools, Inc., 426 U.S. 198, 205 n.10 (1983) (property held in trust for a third party does not become property of the bankruptcy estate).

the Code's distribution scheme), is not novel.

> When property of the estate is alleged to be held in trust, the burden rests upon the claimant to establish the original trust relationship. The claimant must prove title and identify the trust fund or property and, where the fund or property has been mingled with the general property of the debtor, the claimant must sufficiently trace the property. However, if it cannot first be shown that a trust has been created, there is no necessity for inquiry as to whether the property can be identified or traced. Additionally, where the recipient of the funds can by agreement use them as the recipient's own and commingle them with the recipient's own monies, a debtor-creditor relationship exists.[17]

The Bureau relies heavily on In re Reider[18] for its constructive trust argument. It points to Reider's statement that "[a] claimant may prevail on a constructive trust theory where there would otherwise be demonstrable unjust enrichment."[19] The Bureau suggests that Sewall and its creditors have no legal claim to the funds at issue outside of bankruptcy, and thus the estate would be unjustly enriched absent imposition of a constructive trust.[20] In order for the Bureau to demonstrate unjust enrichment of the estate, however, it must prove that the receipts rightfully

---

[17]    Howard v. Burlington Northern & Santa Fe Railway Co. (In re Bangor & Aroostook R.R. Co.), 320 B.R. 226, 232 (Bankr. D. Me. 2005) (quoting 5 Lawrence P. King, Collier on Bankruptcy ¶ 541.11 at 541-59 (15th ed. rev. 2004) (footnotes omitted)), *aff'd*, 2007 WL 607867 (D. Me. 2007).

[18]    177 B.R. 412 (Bankr. D. Me. 1994).

[19]    Id. at 418.

[20]    Notwithstanding that its language appears generally helpful to the Bureau's argument, Reider was a different case. There, insurance proceeds were paid to the trustee following a fire which destroyed the debtor's residence. Id. at 414. Pursuant to a prior divorce judgment, the debtor was to sell that property within a specified period of time and pay half the proceeds to his ex-wife. Id. at 418. The debtor was also required to keep the property insured. Id. This court determined that a necessary implication of that requirement was that such insurance was for the benefit of the ex-wife as well. Id. Thus, a constructive trust was imposed on half of those proceeds for the benefit of the ex-wife. Id. at 419. Reider's holding is inapposite to Sewall's vendee/vendor relationship with the Commission.

6

belong to it. This it cannot do.

Sewall sold lottery tickets and deposited the receipts in its general operating account. There they were commingled with other funds and were available for Sewall's use *for any purpose*. The Commission had authority to sweep the account electronically to collect what it was owed at intervals. But the existence of that authority, and its periodic exercise, amounted only to bargained-for collection rights. It did not transform Sewall's operating account, or any part of it, into a trust res.[21]

Were there any doubt, the other aspects of the license agreements (e.g., tickets deemed "sold" to licensee upon order or delivery, allocation of risk of loss to the licensee after delivery, accrual of interest on overdue payments, liability for costs of collection, the Commission's ability to suspend a license or to impose restrictions on an agent's handling of sales receipts upon three defaults) demonstrate beyond cavil that the Commission's relation with Sewall was

---

[21] See Bangor & Aroostook R.R. Co., 320 B.R. at 232; see also In re Morales Travel Agency, 667 F.2d 1069, 1071-72 (1st Cir. 1981). Morales determined that a bankrupt travel agent did not hold airline ticket sale receipts in trust for an airline, despite language in the debtor's contract with the airline purporting to create a trust.

> Morales was left free to use what it received for its own benefit rather than Eastern's, and to transform the receipts into assets with no apparent encumbrance, upon which potential creditors might rely . . . . Our conclusion is buttressed by other terms of the agreement. Morales' contractual responsibility to a carrier went beyond transmitting the funds actually received, to paying the price of tickets sold whether it received that amount or not. Morales, moreover, was required to transmit the proceeds not upon receipt, nor even upon demand, but at specified regular intervals. Thus for everyday purposes the relationship was the conventional one of debtor-creditor - the 'trust' was a draftsman's concept, designed to rescue Eastern in a situation such as the present but otherwise to be ignored.

667 F.2d at 1071-72.

that of vendor/vendee; there was certainly no express trust, and the facts do not support imposition of a constructive trust.[22]

## 2. Conduit or "Pass Through" Theory

Invoking the First Circuit's decision in City of Springfield v. Ostrander (In re LAN Tamers, Inc.),[23] the Bureau urges another rationale for its contention that Sewall's estate has no interest in the lottery ticket receipts at issue. LAN Tamers' support for the Bureau's position cannot withstand minimal examination.

In LAN Tamers, the debtor installed a high-speed data network and provided support services to public schools under a program (the "E-Rate" program) established by the 1996 Telecommunications Act and directed by the Federal Communication Commission.[24] The program was funded with levies imposed on the telecommunications industry, which were collected in a fund (the "Universal Service Fund" or "USF"). The USF, in turn, was administered by the Universal Service Administrative Company ("USAC"), a regulated not-for-profit corporation, and used to assist public schools in obtaining internet access. Utilizing a need-based formula, USAC would disburse USF monies to pay a portion of the cost of approved

---

[22] The Bureau notes the existence of cases which discuss whether state lottery ticket sales agents act in a fiduciary capacity for purposes of § 523(a)(4). See, e.g., Matter of Tran; 151 F.3d 339 (5th Cir. 1998); Matter of Marchiando, 13 F.3d 1111 (7th Cir. 1994); In re Daniel, 225 B.R. 249 (Bankr. N.D. Ga. 1998); Matter of Schusterman, 108 B.R. 893 (Bankr. D. Conn. 1989); In re Cairone, 12 B.R. 60 (Bankr. D. R.I. 1981). Given the difference in procedural posture between those cases and this, as well as the fact that, as pointed out by the Bureau, Maine law does not require the finding of a fiduciary relationship to support a claim for constructive trust, see In re Reider, 177 B.R. at 417-18, those cases add nothing useful to my analysis.

[23] 329 F.3d 204 (1st Cir. 2003).

[24] Id. at 206.

8

projects. Approved projects could be funded in one of two ways: the schools and USAC could each pay their proportionate share of a project's costs, or, with pre-approval in hand, a school could proceed with a project, pay for it entirely on its own, and later receive reimbursement for USAC's share. Under the latter procedure, USAC was required to disburse funds to the contractor, but did so with protections in place, including an express acknowledgment from the contractor (who had been fully paid) that it would remit the amount due back to the school immediately.[25]

LAN Tamers performed work for the Springfield, Massachusetts, schools. It was paid for the work by the schools. The schools submitted reimbursement requests to USAC and, as part of the paperwork, LAN Tamers signed the written acknowledgment recognizing that it would receive funds from USAC subject to the requirement that Springfield be paid over its reimbursement without delay.[26] LAN Tamers filed bankruptcy. When it did so, USAC was holding over a million dollars designated for reimbursing the Springfield schools for LAN Tamers' work. The City of Springfield filed an adversary proceeding and asserted that the funds were its property.[27]

Examining the character of the reimbursements, the First Circuit considered the structure of the federal program from which they arose. Under USAC's guide for service providers, LAN Tamers "function[ed] merely as a vehicle to deliver the reimbursement back to the applicant."[28]

---

[25]   Id. at 207.

[26]   Id. at 208.

[27]   Id.

[28]   Id. at 211.

Moreover, the program administered by USAC intensely regulated control over the reimbursement funds, leaving LAN Tamers "absolutely no freedom to do anything with the reimbursements except to forward them on to Springfield within ten days."[29] Ignoring the restricted character of the funds would undermine the essential purpose of the federal program under which the funds were created and would provide the estate a windfall of double payment for the work LAN Tamers performed.[30] Thus, the court held that the reimbursement funds held by USAC were not within LAN Tamer's bankruptcy estate.[31]

The LAN Tamers rationale has no bearing on this case. LAN Tamers addressed rights in federal grant monies.[32] They were held by a third party.[33] They had not been delivered to the debtor, let alone commingled with other funds. Here, there is no such discrete fund to examine; instead the Bureau merely claims special rights in a portion of Sewall's operating account - the balance of which accrued, and fluctuated, with revenues from Sewall's diverse business

---

[29] Id. at 212.

[30] Id. at 212-13.

[31] Id. at 215.

[32] Id. at 212; see also Westmoreland Human Opportunities, Inc. v. Walsh, 246 F.3d 233 (3rd Cir. 2001) (debtor's interest in a federal grant relationship determined not to be property of the estate); In re Joliet-Will County Cmty. Action Agency, 847 F.2d 430 (7th Cir. 1988) (all assets held by debtor, consisting of cash and personal property derived from federal grant monies, determined not to be property of the estate); Connecticut v. Novak (In re Cmty. Assocs., Inc.), 173 B.R. 824 (D. Conn. 1994) (three vans purchased by debtor with federal grant funds determined not to be property of the estate).

[33] The First Circuit gave weight to the fact that USAC argued that the funds belonged to the City of Springfield, rather than the debtor's estate. See LAN Tamers, 329 F.3d at 210 (citing Buchanan v. Alexander, 45 U.S. (4 How.) 20, 11 L.Ed. 857 (1846)). "USAC's guidance reiterates the point forcefully" that LAN Tamers was a "mere delivery vehicle." Id. at 212.

10

operations and payment of its myriad expenses. Furthermore, though we are looking at an intensely regulated *activity* (i.e., state-sponsored gambling), we are not dealing with intensely regulated or restricted *property* (i.e., federal grant monies).[34]

As stressed above, Sewall was free to do with the lottery ticket sale receipts whatever it wished, subject to the Bureau's right to sweep up what Sewall owed it from time to time. Rather than the three-party transaction contemplated and created by a complex federal program, as there was in LAN Tamers,[35] we have before us serial sales transactions (Commission to Sewall; Sewall to retail customers) accompanied by procedures designed to encourage (but not insure) that the Commission would be paid for the tickets it sold to Sewall on account.[36]

## Conclusion

For the reasons set forth above, I conclude that the Bureau has no claim to the funds at issue. Sewall owes it money, but that obligation is merely a general unsecured claim against Sewall's estate. The Bureau is not entitled to relief from stay. The sums escrowed under the parties' agreement are estate funds. A separate order consistent with this opinion shall issue forthwith.

Dated: July 16, 2010

/s/ James B. Haines, Jr.
Hon. James B. Haines, Jr.
Judge, U.S. Bankruptcy Court
District of Maine

---

[34] See id. (citing Westmoreland, 246 F.3d at 244-46; Joliet-Will, 847 F.2d at 432); Cmty. Assocs., 173 B.R. at 828-29.

[35] See 329 F.3d at 207.

[36] See Part 1, supra; see also Bangor & Aroostook R.R. Co., 320 B.R. at 240 ("One is not a 'mere conduit' when it exercises unrestricted dominion and control over funds - no matter that it may later have to reckon with its creditors.").

11